UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINE BERNICE MULLINS,

       Plaintiff,                   Civil Action No. 13-10241

              v.                 District Judge VICTORIA A. ROBERTS
                                Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Christine Bernice Mullins ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment be DENIED, that Plaintiff's Motion for Summary Judgment be GRANTED, and that the case be REMANDED FOR AN AWARD OF BENEFITS.

## PROCEDURAL HISTORY

On December 2, 2009 Plaintiff applied for DIB and SSI, alleging a disability onset date of May 10, 2008 (Tr. 145-152). After the initial claim denial, Plaintiff requested an

administrative hearing, held on April 29, 2011 in Detroit, Michigan (Tr. 36).  Administrative

Law Judge ("ALJ") James N. Gramenos presided (Tr. 36).  Plaintiff, represented by Scott

Spokojny, testified (Tr. 47-68), as did Vocational Expert ("VE") Jacquelyn Schabacker (Tr.

68-78).  On August 16, 2011, ALJ Gramenos found  Plaintiff not disabled (Tr. 31).  On

October 26, 2012, the Appeals Council denied review (Tr. 3-5).  Plaintiff filed for judicial

review of the Commissioner's decision on January 18, 2013.

## **BACKGROUND FACTS**

Plaintiff, born April 20, 1974, was 38 at the time of the administrative decision (Tr.

31, 145).  She left school after 10th grade and worked previously as a cashier, lunch worker,

machine operator, and welder (Tr. 168, 171-172).  Her application for benefits alleges

disability as a result of fibromyalgia, arthritis, degenerative disc disease, and acid reflux (Tr.

167).

### A.    **Plaintiff's Testimony**

Plaintiff offered the following testimony:

She was unable to work to as a result of fibromyalgia, arthritis, a herniated cervical

disc, and a mood disorder (Tr. 47).  Subsequent to undergoing December, 2009 cervical disc

surgery, she experienced left hand cramping, bilateral shoulder pain, and  left side numbness

(Tr. 50, 53).  She also experienced concentrational deficiencies, memory loss, and depression

(Tr. 50-52).  She was unable to perform significant lifting or sit for extended periods (Tr. 51).

Medication made her drowsy (Tr. 51).  She experienced range of motion limitations of the

neck (Tr. 51).  Hand cramps created difficulty opening a pill bottle (Tr. 52).  Her shoulder

blades, knees, legs, and hipbone "pop[ped]" (Tr. 52). She was unable to get out of bed on some days due to pain (Tr. 52).

She last worked as a lunch aide, a job that required her to accompany students to the lunch room and then back to their classrooms (Tr. 53). The job also required her to keep the lunchroom clean but did not call for her to lift more than 10 pounds (Tr. 54-55). Her former work as a childcare provider required her to lift up to 25 pounds (Tr. 54). Her former work as a "spot welder" consisted of sorting parts (Tr. 55).

She currently lived in a townhouse with her children, ages 16, 13, and 4 (Tr. 56). The father of the first two children was deceased (Tr. 56). She did not receive help from the father of the youngest child, but the older two children helped with household chores (Tr. 56). She supported herself with Family Independence Agency ("FIA") funds and food stamps (Tr. 57). She was not in a romantic relationship (Tr. 57).

Vicodin prescribed for neck pain took more than one hour to take effect (Tr. 58). She did not obtain significant relief from pain medication but Vicodin helped "a little" (Tr. 58-59). She was unable to bend over to pick an object from the floor (Tr. 59). She did not perform household chores (Tr. 59). She experience difficulty lifting a gallon of milk (Tr. 60). She was unable to walk for more than half a block, stand for more than 20 minutes at a time, or sit for more than 15 (Tr. 60-61). She was unable to reach overhead (Tr. 60). She slept for only two hours each night due to pain and worry and required "one or two naps" every day for up to three hours (Tr. 61). She had no energy during her waking hours (Tr. 61). She did not watch television (Tr. 62). Due to hand cramps, she dropped keys, food, pain pills, and

clothes (Tr. 63). She experienced depression due to her worry about clothing and feeding her children (Tr. 63). Medication for depression helped "a little" (Tr. 64). She did not leave her house, but received visits from her brother and his wife (Tr. 64). As a result of depression, she was oversensitive to comments by others (Tr. 64).

In addition to Vicodin, Plaintiff currently took Lyrica (Tr. 65). She experienced the medication side effects of weight gain, nausea, vomiting, dizziness, blurred vision, constipation, diarrhea, mood swings, frustration, and swelling of the face, hands, and feet (Tr. 65). She vomited every other day and experienced dizziness daily (Tr. 66). She coped with foot swelling by elevating her legs (Tr. 66). She spent 12 of her waking hours each day with her legs elevated (Tr. 66). She also experienced "restless leg symptom" which created shooting leg pains (Tr. 67).

**B.    Medical Evidence**

**1.  Treating Records**

In August, 2009, rheumatologist  J. Paricia Dhar, M.D. noted Plaintiff's reports of joint popping and muscle aches (Tr. 212). Plaintiff indicated that she experienced Post Traumatic Stress Disorder ("PTSD") due to repeated molestations as a child (Tr. 212). She also noted that she was caring for her two-year-old son who had recently undergone cranial surgery and was required to wear a helmet (Tr. 212). Dr. Dhar's examination notes state that Plaintiff demonstrated "tenderness all over" (Tr. 213). Dr. Dhar opined that Plaintiff experienced fibromyalgia secondary to "sexual abuse, physical abuse from her ex-husband and the stress and depression related to being a single parent and having a child who is ill"

-4-

(Tr. 213). Dr. Dhar referred Plaintiff to a fibromyalgia "rehab" program (Tr. 213). A September, 2009 MRI of the cervical spine showed spinal cord compression at C3-C4 (Tr. 203, 365).

In November, 2009 Stanley Frencher, M.D. completed a Residual Functional Capacity Questionnaire, finding that symptoms of fibromyalgia and the cervical spine condition would interfere with Plaintiff's workplace activity on a constant basis (Tr. 205). He found that Plaintiff could stand/walk for up to 10 minutes and sit for 30 (Tr. 205). He found that Plaintiff could sit for up to four hours in an eight-hour workday and stand/walk for less than one (Tr. 205). He precluded all lifting and manipulative functions and found that Plaintiff would be required to take unscheduled breaks every one to two hours (Tr. 205-206). He found that Plaintiff experienced the above-stated limitation since April, 2009 (Tr. 207). In December, 2009, Plaintiff underwent a C3-C4 anterior cervical diskectomy, performed without complications (Tr. 214, 219). In January, 2010, Plaintiff underwent an esophagogastroduodenoscopy, resulting in a diagnosis of gastritis (Tr. 338).

March, 2010 imaging studies of the cervical spine were unremarkable (Tr. 274). An April, 2010 MRI of the left shoulder showed osteoarthritis "with findings suggestive of impingement" and mild rotator cuff tendinosis (Tr. 270). An MRI of the right shoulder showed osteoarthritis "with capsular hypertrophy" with "early impingement" and mild bursitis (Tr. 272).

April, 2010 therapy notes state that Plaintiff was unable to finish therapy due to the need to attend work training (Tr. 307). May, 2010 notes from a "back to work" strengthening

program state that Plaintiff attended "greater than 75 percent" of the sessions (Tr. 300). Badessah R. Kreiman, M.D. stated that Plaintiff was motivated to return to work and reported better functioning (Tr. 300). Dr. Kreiman noted however that Plaintiff's strength had not improved since the previous February (Tr. 301). He noted the presence of "chronic pain," arthritis in both shoulders, and lower extremity swelling as a result of Lyrica use (Tr. 301).

In January, 2011, Dr. Frencher completed a Residual Functional Capacity Questionnaire, finding that Plaintiff experienced sleepiness from Vicodin and Elavil (Tr. 297). He found that Plaintiff was unable to walk for more than one block or sit for more than 30 minutes (Tr. 297). He found that over the course of an eight-hour workday, Plaintiff could sit for up to six hours but stand or walk for a maximum of one hour (Tr. 297). He found that Plaintiff needed to recline for longer than customarily scheduled work breaks (Tr. 297). He limited Plaintiff to less than 10 pounds lifting (Tr. 298). He found that she would be absent from work more than four times a month (Tr. 298). Dr. Frencher's notes from the following month state that Plaintiff was "feeling stress," and continued to experience neck, shoulder, hand, and lower back pain (Tr. 368). Dr. Frencher also noted the presence of "crying and panic attacks" and a diagnosis of fibromyalgia (Tr. 368).

### 2. Non-Treating Records

In February, 2010, S. Obri, M.D. performed a consultative physical examination on behalf of the SSA (Tr. 227-232). Plaintiff reported constant muscle and joint pain (Tr. 227). She had not yet attended post-diskectomy physical therapy due to transportation problems (Tr. 227). She also reported hand cramps, constipation, and heart burn (Tr. 227). Dr. Obri

noted that Plaintiff appeared fully oriented with a normal gait (Tr. 228).  Range of motion studies were not performed due to Plaintiff's use of a post-surgical collar (Tr. 228).

The following month, Terrance A. Mills, Ph.D performed a one-time consultative psychological evaluation on behalf of the SSA (Tr. 233-235).  Plaintiff denied problems with the law or alcohol or drug abuse (Tr. 233).  She experienced sexual abuse as a child from family members and friends (Tr. 233).  Her first husband "slapped and choked her" (Tr. 233).  She experienced anxiety attacks accompanied by shortness of breath (Tr. 233).  She stated that she took care of her three-year-old, but that her two older children helped her with chores and weeding (Tr. 233).  She required help getting into a bathtub, but could dress herself (Tr. 233).

Dr. Mills noted that Plaintiff was neatly dressed but exhibited "very poor" self esteem with a depressed mood  (Tr. 234).  He attributed her memory problems to depression (Tr. 234).  He diagnosed her with Post Traumatic Stress Disorder ("PTSD") and depression, assigning her a GAF of 45 to 50[1] (Tr. 235).

In March, 2010, Rose Moten-Solomon completed a Psychiatric Review Technique on behalf of the SSA, finding the presence of an affective disorder (depression) and the anxiety-related disorder of PTSD (Tr. 251, 254, 256).  Under the "'B' Criteria,' Moten-Solomon found mild limitation in activities of daily living and moderate limitation in social

---

[1]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders* at 34 ("*DSM-IV-TR*")(4th ed.2000).

functioning and concentration, persistence, or pace (Tr. 261). Moten-Solomon also completed a Mental Residual Functional Capacity, finding moderate limitations in the ability to understand, remember, or carry out detailed instructions; maintain attention for extended periods; accept criticism, or get along with coworkers (Tr. 265-266). Moten-Solomon noted that treating records did not contain "the longitudinal evidence of psychiatric treatment" (Tr. 267). She noted that Plaintiff was able to clean, shop, and play with her youngest child (Tr. 267). She concluded that Plaintiff could "engage in simple, repetitive work activity" (Tr. 267).

Notes created by Tariq Mahmood, M.D. later the same month state that the consultative source had not addressed treatment and limitations as a result of fibromyalgia (Tr. 269). In May, 2010, Dr. Mahmood completed a Physical Residual Functional Capacity Assessment, finding that Plaintiff could lift a maximum of 10 pounds, sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 277). He found that Plaintiff could climb, balance, stoop, kneel, crouch, or crawl on an occasional basis and balance on a frequent (as opposed to *constant*) basis (Tr. 276). Plaintiff was limited to occasional reaching overhead (Tr. 279). Dr. Mahmood concluded that Plaintiff's claims were credible (Tr. 281).

### C. Vocational Expert Testimony

The ALJ posed the following set of hypothetical limitations to VE Jacquelyn Schabacker :

[A] hypothetical individual who during a normal eight hour work period,

-8-

assuming normal breaks and meal periods during the work period the hypothetical individual has the following the specific mental and/or physical functional capabilities and functional limitations. Has the lift and/or carry, able to occasionally lift and/or carry weights defined as up to one third of the normal eight[-hour] work period at least up to five pounds in weight. Able to frequently lift and/or carry weight defined as up to two thirds of the work period up to at least five pounds of weight. The issue of standing and/or walking. Able to engage in the positions of standing and/or walking in the work place, assuming normal periods or breaks for an overall total of up to at least two hours during a normal eight-hour work period. Sitting position, assuming normal breaks in any work setting, the hypothetical worker has the functional abilities to engage in sitting positions for periods of time of at least an overall period of six hours when performing work activity. Eliminate jobs that would require the worker to engage in reaching above the shoulder level with either upper extremity. Environmental limitations, eliminate from consideration jobs that would have extremes of cold, heat, wetness or humidity. Hazards in the workplace, eliminate from consideration jobs that would have hazards in the work setting from unprotected areas of moving machinery, heights, ramps, ladders and scaffolding. Relative to the issue of mental and/or communicative functional abilities and limitations, the same hypothetical individual can learn one to three step jobs through either instructions in the English language. Can read a simple message in English. The hypothetical worker requires work that is simple, unskilled, with one to two or three step instructions. The hypothetical worker has the specific basic mental ability to understand, carry out and remember simple, unskilled work instructions. The hypothetical worker has the mental functional ability to respond appropriately to supervision when performing unskilled work activity. Eliminate jobs that would require the worker to be responsible for assigned work tasks with a specific job requirement requires the requir[ing] the work to be functioning as a team member. The same hypothetical worker has the mental functional ability to respond appropriately to usual work situations with coworkers when performing unskilled work activity. The hypothetical worker has the mental functional abilities in dealing with changes in a routine, unskilled work setting, as to the issue of stress, the hypothetical individual has the mental functional capacity to engage in unskilled work activity that does not require exposure to high levels of stress. I define high levels of stress such as would be expected in occupations that would require working in person with the general public or an actual moving assembly line job and not a bench assembly type job (Tr. 68-70).

In response, the VE testified that the hypothetical individual could perform the sedentary,[2] unskilled work of a sorter (1,000 positions in the regional economy); inspector (1,000); and addresser (500) (Tr. 70-71). The VE stated that her testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT"), Selected Characteristics of Occupations, and information provided by the U.S. Department of Labor (Tr. 73).

In response to questioning by Plaintiff's attorney, the VE stated that need to be "off task" for more than 20 percent of the workday; the inability to perform gross or fine manipulations for more than 50 percent of the time; or, the need to miss four or more days of work each month would preclude performance of the above-stated jobs (Tr. 73-74, 76).

### D.    The ALJ's Decision

Citing the medical records, the ALJ found that Plaintiff experienced the severe impairments of "cervical disc herniation post C3-C4 anterior cervical diskectomy and osteophytectomy with anterior interbody arthrosis at C3-C4; bilateral mild rotator cuff tendinosis; [and]major depressive disorder and post-traumatic stress disorder" but that none of the conditions met or equaled any impairment listed in 20 CRF Part 404, Subpart P,

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

-10-

Appendix 1 (Tr.24).  He found that Plaintiff experienced mild limitation in activities of daily living with moderate limitation in social functioning and concentration, persistence, and pace (Tr. 24).  He determined Plaintiff had the following residual functional capacity ("RFC"):

> (1) ability to occasionally and frequently engage in lifting and/or carrying up to at least five pounds of weight; (2) ability to engage in the positions of standing and/or walking in the work place, assuming normal periods of breaks, for an overall total of up to at [least] 2 hours during a normal 8 hour work period; (3) assuming normal breaks in any work setting, the hypothetical worker has the functional abilities to engage in sitting positions for periods of time of at least an overall period of 6 hours when performing work activity; (4) eliminate jobs that would require the worker to engage in reaching above the shoulder level with either upper extremity; (5) eliminate from consideration jobs that have extremes of cold, heat, wetness or humidity; (6) eliminate from consideration jobs that have hazards in the work-setting from unprotected areas of moving machinery; heights; ramps; ladders; & scaffolding; (7) hypothetical worker has the basic mental ability to understand, carry out and remember simple unskilled work instructions; (8) can learn one to three step jobs through either instructions in the English language and/or demonstration; (9) has the mental functional ability to respond appropriately to supervision when performing unskilled work activity; (10) has the mental functional abilities in dealing with changes in a routine unskilled work setting; (11) has the mental functional abilities in dealing with changes in unskilled work setting; (12) has the mental functional capacity to engage in unskilled work activity that does not require exposure to high levels of stress such as would be expected in occupations that require working with the general public, or a job requiring a production-rate pace; (13) eliminate jobs that would require the work to be responsible for assigned work-tasks when the specific job requirements require the worker to be functioning [as] a team member (Tr. 25).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the jobs of addresser, inspector, and sorter (Tr. 30).

The ALJ discounted Plaintiff's allegations of disability, noting that she attended more than three-quarters of her work rehabilitation classes (Tr. 27).  He noted that Plaintiff's diagnosis of fibromyalgia was unsupported by tests regularly used to verify the condition (Tr.

27).  Citing Dr. Dhar's August, 2009 records, the ALJ noted that Plaintiff's ability to care for her youngest son while he was recovering from head surgery undermined her testimony that she was almost completely non-functional (Tr. 28).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any

-12-

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes three arguments in favor of remand.  First, she contends that the ALJ erred by discounting the opinion of treating source Dr. Frencher and overlooking the findings of non-treating source Dr. Kreisman.   Second, she disputes the finding that her testimony was not credible, arguing that  her claims were improperly discounted on the basis that she was able to care for her two-year-old disabled child.  Building on her first two arguments, Plaintiff argues last that the ALJ erred by omitting key functional limitations from the hypothetical question posed to the VE (Tr. 297-298).

-13-

### A.  The ALJ's Discussion of the Medical Evidence

Plaintiff disputes the ALJ's finding that Dr. Frencher "failed to furnish any findings in support of his residual functional capacity." *Plaintiff's Brief* at 14 (citing 28, 297-298). She argues further that assuming Dr. Frencher's assessments were incomplete or ambiguous, the ALJ erred by failing to re-contact the treating source for clarification as required by 20 C.F.R. §§ 404.1512(e), 416.912(e). *Id.* at 19-20.   Plaintiff also faults the ALJ for failing to discuss Dr. Kreiman's February and May, 2010 findings. *Id.* (citing 302-304).

Plaintiff is correct that an opinion of limitation or disability by a treating source is entitled to deference. "[I]f the opinion of the claimant's treating physician is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004). Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.

*Wilson,* at 544 (citing 20 C.F.R. 404.1527(c)(2-6).

Pursuant to § 404.1527(c)(2), the ALJ must provide "good reasons" for allotting less than controlling weight to a treating opinion.  *Gayheart v. Commissioner of Social Security,* 710 F. 3d 365, 376 (6th Cir. 2013)**,** is the latest in a long line of Sixth Circuit cases holding

-14-

that the failure to provide "good reasons" for rejecting a treating physician's opinion constitutes reversible error. *Id.* 710 F. 3d at 376; *Wilson,* at 544-446 (citing § 404.1527(c)(2)). "[T]he Commissioner imposes on its decision-makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole v. Astrue* 661 F.3d 931, 937 (6th Cir.2011). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart,* at 376 (citing SSR 96-2p, 1996 WL 374188, *5 (1996)).

The ALJ's rationale for rejecting Dr. Frencher's opinion is patently inadequate. The ALJ stated only that Dr. Frencher "failed to furnish any findings in support of his residual function capacity, which can be given little weight" (Tr. 28). However, Dr. Frencher's January, 2011 assessment was based on 15 office visits since April, 2009 and diagnoses of fibromyalgia and cervical disc disease (Tr. 297). The record also shows that as Plaintiff's primary physician, Dr. Frencher was at a minimum responsible for referring Plaintiff to a rheumatologist, gastrointestinal specialist, and neurosurgeon - all of whom made Dr. Frencher privy to their findings (Tr. 209, 212, 214, 225). Thus, Dr. Frencher's opinion was not based only on his own treating relationship with Plaintiff, but the opinion of the specialists.

Further, the ALJ's rejection of Dr. Frencher's January, 2011 assessment appears to be based in part on an erroneous interpretation of an August, 2009 diagnosis of fibromyalgia

-15-

by Dr. Dhar, a rheumatologist.  The ALJ rejected Plaintiff's claim that she had fibromyalgia on the basis that "no objective medical findings confirm[] its existence" (Tr. 28).  He supported his determination by stating that although Dr. Dhar "thought that [Plaintiff] might have fibromyalgia . . . no objective findings such as tender points were noted" (Tr. 27).  However, while Dr. Dhar's examination notes did use the precise term "tender points," a term used in diagnosing fibromyalgia, she stated that Plaintiff exhibited "tenderness all over" (Tr. 213).  While Dr. Dhar statement "I think she has fibromyalgia," as cited by the ALJ, might appear  speculative in isolation, in the next sentence Dr. Dhar states, "I explained the *diagnosis* to [Plaintiff] . . ." (Tr. 213)(emphasis added).  Moreover, after examining Plaintiff, Dr. Dhar immediately referred her to a fibromyalgia "rehab" program (Tr. 213).  Dr. Dhar's finding of "tenderness all over," combined with her expertise as a rheumatologist in diagnosing fibromyalgia, stands at odds with the ALJ's determination that the condition had not been properly diagnosed.     In addition, none of Plaintiff's later medical providers disputed the fibromyalgia diagnosis by Dr. Dhar.  Thus, Dr. Frencher's finding that Plaintiff experienced disabling exertional, postural, and manipulative limitations (not wholly accounted for by the imaging studies of the shoulders and neck) appears to have been reasonably based on Dr. Dhar's fibromyalgia diagnosis (Tr. 297-298).

The ALJ's misreading of Dr. Dhar's findings undermines his rejection of Dr. Frencher's opinion.   Likewise, while the ALJ cited Dr. Kreiman's records in noting that Plaintiff had attended 75 percent of her "rehab" classes, he ignored the Kreiman's observations of hand cramping and diffuse pain, which would also support the diagnosis of

fibromyalgia (Tr. 301, 302-304).

Thus, the ALJ gave wholly inadequate reasons for rejecting the opinion of Plaintiff's treating physicians.  Nothing significantly contradicts Frencher's finding that Plaintiff would be absent from work more than four time per month; that she would need to recline for longer than scheduled work breaks; or that she experienced chronic neck, shoulder, hand, and lower back pain.[3]

## B.  The Credibility Determination

Next, Plaintiff faults the ALJ for discounting her claims of limitations on the basis that she was able to care for her disabled child.  *Plaintiff's Brief* at 22-24 (citing Tr. 28).    She also contends that the ALJ failed to account for her medication side effects in crafting the RFC.  *Id.*

"An ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse v. Commissioner of Social Sec.,*  502 F.3d 532, 542 (6th Cir. 2007) (citing *Walters v. Commissioner of Social Sec.,* 127 F.3d 525 531 (6th Cir. 2007)).  *See also Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir.1993); *Anderson*

---

[3] Not only are Frencher's opinions corroborated by Dr. Kreiner, but Dr. Mahmood, a consultative source,  also found Plaintiff's claims to be credible, and criticized Moten-Solomon's conclusions for not having considered the effects of fibromyalgia.

-17-

*v. Bowen* 868 F.2d 921, 927 (7th Cir.1989) ( *citing Imani v. Heckler,* 797 F.2d 508, 512 (7th

Cir.1986)) (An ALJ's "credibility determination must stand unless 'patently wrong in view

of the cold record' "). "Nevertheless, an ALJ's assessment of a claimant's credibility must be

supported by substantial evidence." *Walters,* at 531.

Here, the ALJ discounted Plaintiff's allegations of disability on the basis that she was

able to care for her disabled toddler during the relevant period (Tr. 28).  He found that

Plaintiff's activity report, completed at the time of the application for DIB, contradicted her

hearing testimony that she spent most of the day in bed (Tr. 28).  However, Plaintiff's

activity report states that she performed household and childcare chores intermittently, rather

than regularly, indicating, for example, that she made breakfast and lunch for her youngest

child,  slept when her older children came home from school, ate dinner, slept, spent time

with the older children, and slept (Tr. 182-183).  Likewise, Plaintiff's statement that she was

able to prepare three meals a week and shop for groceries once a month is not inconsistent

with her hearing testimony that she spent most of her time reclining (Tr. 184-185).  *See*

*Walston v. Gardner,* 381 F.2d 580, 586 (6th Cir.1967)(claimant's ability to drive, grocery

shop, wash dishes and sweep floor on an intermittent basis does not establish the "ability to

engage in  substantial  gainful  activity");  *Fulwood  v.  Heckler,*  594  F.Supp.  540,  543

(D.C.D.C.1984)(same).  The ALJ's misreading of Dr. Dahl's fibromyalgia diagnosis, as

discussed in Section **A.**, also taints the finding that Plaintiff's claims of limitation were not

credible.

### C.  The Hypothetical Question to the ALJ

Plaintiff argues that because the hypothetical question did not contain all of the limitations found in Dr. Frencher's January, 2011 opinion, the VE's corresponding job findings do not constitute substantial evidence. *Plaintiff's Brief* at 24-25.

Vocational testimony given in response to the hypothetical question constitutes substantial evidence only if the question accurately portrays the individual's physical and mental impairments. *Varley v. Commissioner of Health and Human Services,* 820 F.2d 777, 779 (6th Cir.1987). While the Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec.* 368 F.3d 629, 632 (6th Cir.2004). Although the question to the VE must account for the claimant's full degree of limitation, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115, 118-119 (6th Cir.1994) ( *citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987)).

To be sure, the ALJ posed a lengthy and detailed hypothetical question to the VE (Tr. 68-70). However, the ALJ's choice of hypothetical limitations (like the treating physician analysis and credibility determination) was undermined by his erroneous conclusion that the medical transcript did not contain a diagnosis of fibromyalgia. *See Teverbaugh v. Comm'r of Soc. Sec.,* 258 F.Supp.2d 702, 706 (E.D.Mich.2003) (Roberts, J.)(job findings made in response to an incomplete set of limitations do not constitute substantial evidence). Because the ALJ's choice of hypothetical limitations was based on a misreading of the evidence, the

VE's response to the hypothetical question was flawed and the ALJ's decision denying benefits was not based on substantial evidence.

This record, showing significant physical and non-exertional limitations[4], establishes a particularly strong case for disability, *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 176 (6th Cir.1994), and therefore, in light of this trilogy of fundamental errors, the case should be remanded for an award of benefits.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be DENIED, that Plaintiff's Motion for Summary Judgment be GRANTED, and that the case be REMANDED FOR AN AWARD OF BENEFITS.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v.*

---

[4] Perhaps as a result of horrendous life experiences, including sexual abuse as a child and physical abuse at the hand of her husband, Plaintiff suffered from PTSD and depression. Dr. Mills, a consultative source, assigned her a GAF of 45 to 50 in March of 2010 (Tr. 235). This would indicate "serious impairment" in functioning. *See* fn. 1, *supra.*

*Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6ᵗʰ Cir. 1987). Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response. The response shall be not more than 20 pages in

length unless by motion and order such page limit is extended by the court. The response

shall address specifically, and in the same order raised, each issue contained within the

objections.


Dated: January 27, 2014              s/R. Steven Whalen_____
                                     R. STEVEN WHALEN
                                     UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on
January 27, 2014, electronically and/or by U.S. mail.

                                     s/Michael Williams_____
                                     Case Manager for the
                                     Honorable R. Steven Whalen